UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULINE ASHTON, as Next Friend
of E.B., a minor,

        Plaintiff,

                                   CASE No. 1:22-cv-819

v.

                                   HON. ROBERT J. JONKER

OKEMOS PUBLIC SCHOOLS, et al.,

        Defendants.

_____/

## OPINION AND ORDER

### INTRODUCTION

Plaintiff Pauline Ashton's daughter, E.B., served a time-limited expulsion from her high school after she lied to her parents and to the police about her interaction at school with an administrator and tried to get another student to back her false story. E.B. actually admits she falsely accused the administrator but Plaintiff nevertheless claims the school was wrong to discipline E.B. for it. Plaintiff further claims the school and its administrators are liable for overbroad search policies and for retaliatory school discipline. There is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law.

### FACTUAL BACKGROUND

### 1. Overview

In 2021, school officials at Okemos High School began spot checking school bathrooms to stem a rise of violence and to curb vape and e-cigarette use amongst its students. Vape pens and other like devices are more difficult for school officials to detect than traditional tobacco and

marijuana products because they are easier to conceal and do not emit odors.  But experience taught the administrators that students would often congregate in a single bathroom stall to vape together, and so the spot checks included a brief look underneath the bathroom stall partitions from public areas in the bathroom to see if multiple students were in the same stall together. Nothing in policy or practice permitted officials to look inside the stall in a way that would allow viewing of students using the toilet.

In the spring of 2022, Plaintiff Pauline Ashton's daughter, E.B., was subject to two searches by school officials.  The first search was a minimal no-contact search of E.B.'s person after another student complained about E.B. and other students vaping in the school bathroom. The second search took place approximately three weeks later when E.B. was in a bathroom stall speaking with another student.  During that search the assistant principal, Alison Cironi, conducted a spot check and leaned down from a common area to look underneath the stall partitions.  But the story E.B. later told her parents was that the assistant principal had approached E.B.'s stall and looked into it while E.B. was urinating.  Based on their daughter's report, E.B.'s parents complained to the school and then to the police.  It quickly became clear, however, that E.B.'s story about Ms. Cironi was not true.  Compounding matters, it later came out that E.B. had asked another student to lie for her, and that E.B.'s friends threatened that student to back up E.B.'s falsehood.  A disciplinary hearing was held, and the school board decided to expel E.B. for 180 days.

In this lawsuit alleging several constitutional claims, Plaintiff contends that this is not a case about a school disciplining a student for making false reports to the police about school administrators.  Rather, she claims, it is a case about school bathroom privacy; a school district's allegedly unconstitutional search policies; and the school's retaliatory actions towards a student

and her parents who complained about those policies.  The defense moves for summary judgment.  For the reasons explained in full below, the Court concludes there is no genuine issue of material fact for trial but that the Defendants are entitled to summary judgment in their favor on Plaintiff's claims and that this case should be dismissed.

### 2. *Okemos High School's Response to Vaping*

Plaintiff Pauline Ashton's daughter, E.B., was a sophomore at Okemos High School during the 2021/2022 school year.  That year the school was returning to in-person learning following the outbreak of the COVID-19 pandemic.   This proved to be a difficult transition for the students.  The school's assistant principal, Ms. Cironi, testified that in addition to dealing with an increase in violence on school grounds, the school experienced a rise in students' use of prohibited vaping devices.  (Cironi Dep. 27, ECF No. 38-4, PageID.779).  Given the violence and vape use, some students complained to school administrators that they did not feel safe using the school bathrooms.  (Cironi Dep. 27, ECF No. 38-4, PageID.779).

Curtailing vape use proved to be a challenge to the school.  Dr. Sharp (who served as the high school's interim assistant principal during the events of this case) testified that vaping devices were more difficult to detect than traditional tobacco and marijuana products.   This was because vaping devices are less obvious, and their use does not emit an odor.  (Sharp Dep. 65, ECF No. 38-3, PageID.747).  But at some point during the school year, school administrators determined that students would oftentimes congregate in a single bathroom stall to use vaping devices.  (*Id.* at 47, 65-67).  And to combat the rise of vape use on school grounds, school administrators decided to conduct occasional bathroom checks.  To perform these checks, a school official would enter a bathroom corresponding to the official's gender and conduct a visual inspection of the common areas.  This inspection included a count of the number of sets of

feet that were visible underneath a bathroom stall partition.  (Cironi Dep. 27-28, 32-33, ECF No. 38-4, PageID.779-780).

### 3.    E.B. is Searched on April 8, 2022, after Ms. Cironi Received a Complaint About Vaping

On April 8, 2022, a student told Ms. Cironi that several other students, including E.B., were vaping in the school bathroom.  The student was emotional because one of the students had blown smoke in her face.  (Cironi Dep. 36-37 ECF No. 38-4, PageID.781).  Ms. Cironi and Dr. Sharp decided to interview the students that had been reported to Ms. Cironi.

E.B. was brought to Dr. Sharp's office.[1]  Another security staff member, and Dr. Sharp's female administrative assistant were also present at the meeting.  Dr. Sharp told E.B. that they had heard rumors that E.B. had been vaping.  (Sharp. Dep 52, ECF No. 38-3, PageID.744; E.B. Dep. 13, ECF No. 38-5, PageID.804).  E.B. denied vaping and further denied having disposed of vaping products prior to being brought into Dr. Sharp's office.  Dr. Sharp then performed a no-contact search of E.B.'s person.[2]  E.B. testified that she was told to pull out her pockets, and that officials looked at her waistband.  She also lifted her pants up so that the administrators could look at her socks.  (E.B. Dep. 99, ECF No. 38-5, PageID.822).  The search did not result in finding any contraband.[3]  E.B. returned to her classroom and she was not disciplined.  (Sharp Dep. 59-61, ECF No, 38-3, PageID.746).

---

[1] Ms. Cironi and Dr. Sharp were each assigned different grades for their caseload.  E.B., a sophomore, was on Dr. Sharp's caseload.  (Cironi Dep. 40, ECF No. 38-4, PageID.782).
[2] The student handbook provided that school authorities were permitted to search a student's person or personal property, to enforce school rules, if authorities had a reasonable suspicion that prohibited items were likely to be found on a student's person.  (ECF No. 38-21, PageID.927).
[3] There is some indication in the record that E.B. later told the school board at the expulsion hearing that she had a vape pen on her person that was not discovered during the search.  (*See* Sharp Dep. 59, ECF No. 38-3, PageID.746; E.B. Dep. 11, ECF No. 38-5, PageID.804).  And during her deposition E.B. admitted that she sometimes vaped while at school.  (E.B. Dep. 12, 14, ECF No. 46, PageID.1040, 1043).  But E.B. was adamant that she did not have a vape pen on

Later, E.B. told her mother, Pauline Ashton, and stepfather, Michael Ashton, about the incident.  Her parents complained to Dr. Sharp that they were not notified about the search. (ECF No. 46-5).  E.B.'s parents testified that they were not satisfied with the assistant principal's explanation, but it does not appear that they pursued the matter any further at the time.  (M. Ashton Dep. 19, ECF No. 46-3, PageID.1600).

### 4.    Ms. Cironi Performs a Bathroom Check on May 4, 2022

A few weeks later, on May 4, 2022, Ms. Cironi was monitoring the hallways during the lunch period.  Midway through the break, Ms. Cironi noticed several students walk into a bathroom together.  Ms. Cironi believed that there were more students entering the bathroom than there were available stalls, and so she decided to enter the bathroom to see if everything was alright.  (Cironi Dep. 47-48, ECF No. 38-4, PageID.784).

Ms. Cironi testified that she walked in, made initial contact with a group of students, and knelt from the sink area to look under the stall partitions.  Ms. Cironi believed she saw one set of feet in the stalls.  To get a better look, she took a few more steps into the bathroom and knelt down again, but she did not approach the row of stall doors.  (Cironi Dep. 58-61, ECF No. 38-4, PageID.787).  Having completed her check, Ms. Cironi left the bathroom.  Ms. Cironi estimated that, all told, she was in the bathroom for approximately one minute.  (Cironi Dep. 38-4, PageID.788).

### 5.    E.B. Provides a False Story to Her Parents

One of the students in the bathroom during Ms. Cironi's search was E.B.  E.B. testified that she went into a bathroom stall with another student (S.N.) to talk about a third student

---

her person on April 8, 2022, and if she had said anything to the contrary during the hearing, she had been confused.  (E.B. Dep. 10-12, 99, ECF No. 38-5, PageID.804, 822*).*  To the extent there is a factual dispute here about the April 8, 2022, events, it is not material to the issues for decision.

(A.L.). A.L. followed E.B. and S.N. into the bathroom and stood outside the closed stall door while E.B. and S.N. were inside together. (E.B. Dep. 107-108, ECF No. 46, PageID.1195-1196). While E.B. and S.N. were in the stall together, S.N. sat on top of the toilet so as not be seen and to avoid the hassle of being searched. (E.B. Dep. 16, ECF No. 46, PageID.1047). E.B. testified she and S.N. were merely talking. They were not vaping in the stall (E.B. Dep. 113-114, ECF No. 46, PageID.1205-1206); nor were they using the bathroom for its intended use, and they did not remove their clothing while in the stall. (E.B. Dep. 116-117, ECF No. 46, PageID.1209-1211).

E.B. heard Ms. Cironi come in and recognized her voice. (E.B. Dep. 17-18, ECF No. 46, PageID.1048-49). E.B. knew that school staff would sometimes come into the bathrooms to check for possible vape use. (E.B. Dep. 17, ECF No. 46, PageID.1048). E.B. heard Ms. Cironi ask how many students were in the stall and heard A.L. respond to Ms. Cironi by answering "one." (ECF Dep. 119, ECF No. 46, PageID.1214-1215). E.B. did not see Ms. Cironi. (E.B. Dep. 19-20, ECF No. 46, PageID.1052-1053).

E.B. and S.N. exited the stall shortly after Ms. Cironi left the bathroom. E.B. had a brief conversation in which A.L. told E.B. that Ms. Cironi had looked under E.B.'s stall. (E.B. Dep. 21, ECF No. 46, PageID.1055). E.B. testified that she assumed from A.L.'s response that Ms. Cironi had approached A.L., and thus she had come to the front of E.B.'s stall before bending down to look underneath the stall. (E.B. Dep. 40, 132, ECF No. 46, PageID.1085-1086, 1236)

E.B. then texted her mother to tell her that "one of the staff members looked under the stall." (E.B. Dep. 23, ECF No. 46, PageID.1057). Michael Ashton testified that he was with his then-wife Pauline when she received the text. The two discussed the matter, and they were upset enough that they decided to go to the school to speak with Ms. Cironi about the bathroom search.

6

(M. Ashton Dep. 23-27, ECF No. 38-7, PageID.827-828).  Pauline and Michael spoke with Dr. Sharp, who informed Ms. Cironi about the Ashtons' complaint.[4]  Later that day, Ms. Cironi called Pauline Ashton to explain the reasoning behind the bathroom checks.  (Cironi Dep. 68-69, ECF No. 38-4, PageID.789).  Ms. Cironi specifically explained that she had not gone past the sink area when conducting the checks.

But E.B. told her parents she believed that Ms. Cironi was lying because of what she had been told by A.L.  (P. Ashton Dep. 88, ECF No. 46-2, PageID.1498).  E.B. also told her parents two things that she did not hear from A.L., and that E.B. knew to be false.  (E.B. Dep. 43, ECF No. 46, PageID.1091).  First, E.B. told her parents she could see Ms. Cironi's hair through the crack in the stall door (E.B. Dep. 29, ECF No. 46, PageID.1067).  And second, E.B. told her parents that she was urinating when Ms. Cironi had looked into her stall.  (E.B. Dep. 45, ECF No. 46, PageID.1093-1094).

### 6.    *E.B.'s Parents Call the Police*

Michael Aston testified that at that point he and Pauline had two competing versions of the bathroom search.  There was the version of events that Ms. Cironi had told them, and then there was the version of events that E.B. had told them which was that "people are looking under the stalls at me."  (M. Ashton Dep. 31, ECF No. 38-7, PageID.829).

Mr. Ashton was not satisfied that the high school would get to the bottom of things, and so he decided to call the Meridian Township Police Department.  Mr. Ashton eventually spoke with Officer LeRoy, a school resource officer.  Mr. Ashton reported that E.B. had been part of an inappropriate situation involving Ms. Cironi earlier that day; that Ms. Cironi had looked under

---

[4] Dr. Sharp testified that E.B. was at this meeting as well, and that she told him that Ms. Cironi had looked into her stall while E.B. was urinating.  Plaintiff says that only Pauline and Michael were present at this meeting.  For purposes of deciding this motion, the Court accepts Plaintiff's version of events.

E.B.'s bathroom stall while E.B. was urinating, and that she had locked eyes with E.B. (M. Ashton Dep. 36-37, ECF No. 38-7, PageID.830; LeRoy Dep. 19, ECF No, 38-9, PageID.849).[5] E.B. also spoke to the officer, and she told him that Ms. Cironi had looked under the stall door. (E.B. Dep. 33, ECF No. 46, PageID.1074).  Officer LeRoy also testified that in this initial phone call, E.B. admitted that she had not see Ms. Cironi, and was just reporting what her friend (A.L.) had told her.  (LeRoy Dep. 22-23, ECF No. 38-9, PageID.850).

### 7.    *E.B. asks A.L. to Lie for Her*

The next day, May 5, 2022, E.B. met with A.L. in the same bathroom where the incident took place.  E.B. asked A.L. to re-enact the previous day's events.  E.B. testified that after watching A.L., she realized that Ms. Cironi had not stood directly in front of the stall as she had assumed from A.L.'s earlier reports.  (E.B. Dep. 154, ECF No. 46, PageID.1271).

Later, E.B. sent A.L a text that asked A.L. to lie for her and to tell school officials that Ms. Cironi was by the stall when she knelt down to count feet.  (E.B. Dep. 39, ECF No. 46, PageID.1083-1085).  "[T]he objective here" E.B. told A.L. "is to get [Ms. Cironi] in trouble." (ECF No. 38-10, PageID.858).  During her deposition, however, E.B. claimed that she was not trying to get Ms. Cironi in legal trouble, but rather to get school officials to stop looking under the bathroom stalls.  (E.B. Dep. 42, ECF No. 46, PageID.1088-1089).

### 8.    *Officer LeRoy's Investigation Determines E.B.'s Story Was False*

That afternoon, Officer LeRoy arrived at the school to continue his investigation.  Earlier that day he had another conversation with Mr. Ashton, in which Mr. Ashton reiterated that Ms. Cironi had locked eyes on E.B. while she was in the bathroom stall.  (LeRoy Dep. 28-29. ECF

---

[5] E.B. testified that she never told her stepfather that Ms. Cironi had locked eyes on her.

No. 38-9, PageID.852).[6]   When Officer Leroy arrived, he was told by the school principal, Andrea Hallead, that A.L. had come forward with information about the case.  (LeRoy Dep. 29-30, ECF No. 38-9, PageID.852).  Officer LeRoy then interviewed A.L.  During the interview, A.L. told Officer LeRoy that Ms. Cironi had not approached E.B.'s stall during the bathroom search, and that E.B. had asked A.L. to lie for her.  (LeRoy Dep. 30-31).  She showed the officer the text message that A.L. had sent her.  (*Id.*).

Thereafter, Officer LeRoy called Michael Ashton and asked him to bring E.B. to the police station to be interviewed.  Michael agreed, and the Ashtons brought E.B. to the police station later that day.  Officer LeRoy interviewed E.B. alone.  He testified that initially E.B. told him that Ms. Cironi had stood in front of the bathroom stalls while she was trying to urinate, and that E.B. could see Ms. Cironi's hair as she bent down to look under the stall.  (LeRoy Dep. 37-38, ECF No. 38-9, PageID.854).[7]   Later, however, E.B. admitted that she wasn't telling the truth.  (LeRoy Dep. 41, ECF No. 38-9, PageID.855).  Officer LeRoy's report details this sequence of events.  (ECF No. 38-17, PageID.907).

Having determined that E.B. had provided an inaccurate version of events, Officer LeRoy concluded his investigation.  (Officer LeRoy Dep. 43, ECF No. 38-9, PageID.855).  Michael

---

[6] Mr. Ashton also emailed school officials shortly after noon on May 5, 2022, to complain about the search policies.  In describing the previous day's events, he stated "the vice principal was looking under the stall doors in the female bathroom to check for rule violations.  She was literally looking under the door, not walking by checking feet."  (ECF No. 38-11, PageID.861).

[7] On January 16, 2024, Plaintiff filed a motion to file a video exhibit of E.B.'s interview with Officer LeRoy.  (ECF No. 55).  Plaintiff contends the video contradicts certain portions of Officer LeRoy's recollection of the interview and ask the Court to consider the videos under *Scott v. Harris*, 550 U.S. 372 (2007).  In a February 6, 2024, stipulation, the defense does not object to Plaintiff's request to supplement the record with the video exhibit.  Plaintiff's position notwithstanding, the defense says the video confirms that E.B. knew that she was making false accusations and later recanted. (ECF No. 61). The Court denies the motion to supplement and rejects the stipulation.  Neither side offers any justification for the tardy submission.  More fundamentally, however, the alleged discrepancies between the officer's recollection of the interview and the recorded video have no bearing on the issues for decision.

Ashton testified that after E.B.'s interview, he and Pauline learned that E.B. had withheld information from them and he felt that E.B. had been manipulative.  (M. Ashton Dep. 49-50, ECF No. 46-3, PageID.1651-1652).  That evening he sent an email to the school board, the principal, and the superintendent.  In his email, Mr. Ashton admitted that he had an inaccurate version of the facts.  He stated that he now knew that Ms. Cironi "did NOT look under the stall door in an inappropriate way."  (ECF No. 38-11, PageID.861).  E.B. also sent an email to Ms. Cironi acknowledging that she had lied.  (ECF No. 38-12).

   *9.      The School's Investigation*

The school's investigation then turned to E.B.'s actions.  Dr. Sharp spoke with A.L., who told him that E.B. had in fact been vaping in the stall with S.N.  A.L. confirmed that E.B. had asked her to lie on her behalf.  Dr. Sharp also testified that A.L. told him two of E.B.'s friends had approached her and told her that if she didn't corroborate E.B.'s version of events, E.B. would take A.L. out to a field and leave her there, which A.L. interpreted as a threat that she would be buried.  (Sharp Dep. 156-157, ECF No. 38-3, PageID.771).  Dr. Sharp recorded his notes following his conversation with A.L.  (ECF No. 38-13).

Dr. Sharp met with E.B. and her parents on May 9, 2022.  He gave them a prepared letter stating that E.B. had been suspended for ten days, and that he would be recommending to the Okemos Board of Education that E.B. be expelled for a period of 180 days.  The basis of the decision was termed "intimidation," and the letter detailed that E.B. had made up a false story and that E.B. and her parents filed a false police report that accused Ms. Cironi of criminal wrongdoing.  (ECF No. 38-14).

An expulsion hearing was held by the Board of Education on May 17, 2022.  (ECF No. 38-16).  A disciplinary packet was prepared in advance of the hearing.  (ECF No. 38-17).

Plaintiff learned of the hearing the week before it was held.  (P. Ashton Dep. 51-52, ECF No. 38-8, PageID.841).  E.B., Mr. and Mrs. Ashton, and their counsel, attended the hearing.  (P. Ashton Dep. 56, ECF No. 38-8, PageID.842).  Counsel for Plaintiff presented Plaintiff's version of the story, and both Plaintiff and E.B. gave testimony.  (P. Ashton Dep. 56-58, ECF No. 38-8, PageID.842-843).  At the conclusion of the hearing, the school board determined, based a preponderance of the evidence, that E.B. had engaged in conduct that involved the intimidation of another student in violation of the student handbook; that she had made false statements accusing an administrator of a sex crime; and that Michael Ashton had filed a false police report on E.B.'s behalf.  (Gebara Decl. ¶ 10, ECF No. 38-18, PageID.914).  The school board determined that E.B. should be expelled for a period of 180 days, but that she would be permitted to petition for early reinstatement.  (Gebara Decl. ¶ 13, ECF No. 38-18, PageID.915).

Plaintiff petioned for early reinstatement on behalf of E.B. on December 20, 2022.  On January 6, 2022, the superintendent ordered that E.B. be reinstated effective January 16, 2023.  (ECF No. 38-20).

## PROCEDURAL HISTORY

On September 6, 2022, Plaintiff Ashton filled this lawsuit on her daughter's behalf.  (ECF No. 1).  The corrected Complaint (ECF No. 22) sues Okemos Public Schools; the Okemos Public School Board; four school board members; John Hood (the superintendent) Andrea Hallead (the school principal); Allison Cironi; and Mark Sharp.  The Complaint further contains eight claims for relief, which Plaintiff captioned as follows: Count I: First Amendment Violation; Count II: First Amendment Retaliation; Count III: *Monell* Liability; Count IV: Fourteenth Amendment Violation – Procedural Due Process; Count V: Fourteenth Amendment Violation – Substantive Due Process; Count VI: Breach of Contract; Count VII: Policy is Unconstitutional;

11

and Count VIII Policy and Custom is Unconstitutional in Violation of Fourth Amendment (ECF No. 22).

At the Rule 16 scheduling conference, the Court denied Plaintiff's request for emergent relief and declined the exercise of supplemental jurisdiction over the state law claims.  All agreed at the conference that the case would move forward on five main federal claims: First Amendment; First Amendment Retaliation; Procedural Due Process; Substantive Due Process; and *Monell* liability.  On September 7, 2023, the parties stipulated to the dismissal of the four individual school board member defendants, leaving Plaintiff's federal claims against the entity defendants as well as Defendants Hood, Hallead, Cironi, and Sharp.

The defense filed this motion for summary judgment on November 8, 2023.  (ECF No. 38).  Plaintiff responded in opposition to the motion on December 20, 2023.  (ECF Nos. 44, 45, and 46).  The defense filed its reply on January 17, 2024.  (ECF No. 57).  After reviewing the motion papers, the Court determined that oral argument would not assist the Court in resolving the issues for decision and canceled the hearing set in this matter. (ECF No. 53).  The matter is ready for decision.

## LEGAL STANDARDS

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Parks v. LaFace Records*, 328 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56(c)).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*,. 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.  574, 587 (1986).  But that

does not mean that any amount of evidence, no matter how small, will save a nonmoving party from losing on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

The defense presents three primary arguments in favor of summary judgment. First, the defense seeks the dismissal of the official capacity claims against the remaining individual Defendants as redundant to the claims against the entity Defendants. Second, the defense contends that none of Plaintiff's constitutional claims have merit, and that Plaintiff cannot demonstrate that the school or the school board is responsible for the alleged violation. Third, the defense contends that at a minimum the individual Defendants are entitled to qualified immunity. (ECF No. 38). Plaintiff's response (ECF No. 45) is not a model of clarity. Throughout the brief, Plaintiff takes pains to emphasize her view that neither E.B. nor Michael Ashton ever accused Ms. Cironi of a crime; nor did they engage (she says) in actionable defamation. Furthermore, Plaintiff alleges that the disciplinary packet prepared for the expulsion hearing contained several material misstatements. On this basis, Plaintiff contends that she has done enough to create a triable claim on all counts. For the reasons that follow, Defendants have demonstrated they are entitled to summary judgment on all claims.

### 1. *Official Capacity Claims*

Unlike individual capacity suits, which seek to impose personal liability upon a government official for actions he takes under color of state law, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 690 n.55 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v.*

*Graham,* 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt,* 469 U.S. 464, 471–72 (1985)). "It is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. at 166.  Defendants claim that the official capacity claims against Defendants Hood, Hallead, Cironi and Sharp are redundant to the claims against the entity defendants. Plaintiff's brief does not address this argument.  The Court agrees that these claims are redundant to the claims against the entity Defendants, and thus dismisses the official capacity claims against the remaining entity Defendants.

### 2.  *No Constitutional Violation*

The defense contends that Plaintiff has not demonstrated a constitutional violation as to any of the substantive constitutional counts.  The defense's argument has merit.

#### A.  *First Amendment Violations*

Plaintiff's first two claims involving the First Amendment ask whether Defendants could punish E.B. for her reports about Ms. Cironi.  After its review and drawing all reasonable inferences in favor of the non-moving party, the Court determines that Defendants did not violate E.B.'s free-speech rights by expelling her, and that the defense is entitled to summary judgment on the First Amendment claims.

##### I.      *Ability to Regulate*

"The First Amendment, applicable to the states through the Fourteenth, prohibits the government from 'abridging the freedom of speech.'"  *Ison v. Madison Local School District Board of Education*, 3 F.4th 887, 892-93 (2021) (quoting U.S. Const. amend. 1).  "Though broadly phrased, the freedom of speech is not unlimited."  *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023).  Expression, for example, is "subject to reasonable time, place, or manner restrictions."  *Id.*  (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S.

288, 293 (1984)).  "The schoolhouse is one such restriction."  *Id.*  To be sure, courts have long held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969). But a student's First Amendment rights "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988) (quoting *Tinker,* 393 U.S. at 506).  And "their First Amendment rights 'are not automatically coextensive with the rights of adults in other settings[.]'" *Kutchinski,* 69 F.4th at 356 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)).

"The Supreme Court has outlined four categories of student speech that schools may regulate."  *Id.*  These categories are "(1) indecent, offensively lewd, or vulgar speech uttered during a school assembly on school grounds; (2) speech during school or at a school-sponsored event that schools reasonably regard as promoting illegal drug use; (3) speech in school-sponsored expressive activities if the schools' actions are reasonably related to legitimate pedagogical concerns; and (4) on-campus and some off-campus speech that materially disrupts classwork or involves substantial disorder or invasions of the rights of others."  *Id.* at 356-57 (internal citations and quotation marks omitted).

Both sides approach the analysis using the fourth category involving the regulation of off-campus speech.  In *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S ___, 141 S. Ct. 2038 (2021), the Supreme Court determined that the "special characteristics that give schools additional license to regulate student speech" do not always disappear when a school regulates speech that takes place off campus.  *Id.* at 2045.  There were, however, three cautions that "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway."  *Id.* at 2046.  First, "for off-campus speech, the school rarely stands *in loco*

*parentis*." *Kutchinski*, 69 F.4th at 357.  And so "off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id.* (quoting *Mahanoy*, 141 S. Ct. at 2046).  Second, "courts must be skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all.  *Mahanoy*, 141 S Ct. at 2046.  "Third, the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id.*

Citing Justice Alito's concurring opinion in *Mahanoy*, the Sixth Circuit in *Kutchinski* viewed a school's ability to regulate off-campus speech on a spectrum.  "At one end of the spectrum, schools can probably 'regulate speech that takes place during or as part of what amounts to a temporal or spatial extension of the regular school program[.]'" *Kutchinski*, 69 F.4th at 357 (quoting *Mahanoy*, 141 S. Ct. at 2054 (Alito, J., concurring)).  "At the other end of the spectrum, schools generally cannot regulate 'speech that is not expressly and specifically directed at the school, school administrators, teachers, or fellow students and that addresses matters of public concern.'" *Id.* (quoting *Mahanoy*, 141 S. Ct. at 2055 (Alito, J., concurring).  "The middle of the spectrum includes 'speech that criticizes or derides school administrators, teachers, or other staff members' or involves criticism or hurtful remarks about other students.'" *Id.* (quoting *Mahanoy*, 141 S. Ct. at 2057).

Here, E.B.'s speech involved, at a minimum, admitted untruthful statements to the police about school administrator conduct involving interactions with students on the school property.  Thus, Defendants could regulate the speech and discipline E.B. so long as the speech materially disrupted classwork or involved substantial disorder or invasions of the rights of others.  It plainly did.  Accusing school administrators to the police regarding admittedly false statements about their interactions with students on school property not only threatens to disrupt normal

16

administration of school rules and polices but also invades the rights of administrators to be free of accusations the complaining student knows, by her own admissions, are false.

In arguing for a contrary conclusion, Plaintiff musters several arguments throughout the briefing, none of which the Court finds to be persuasive. First, Plaintiff contends that the defense has never identified the specific statements uttered by E.B. that justified the discipline. Relatedly, Plaintiff contends that E.B.'s speech falls closer to the end of Justice Alito's spectrum involving matters of public concern, namely the search policy of the Okemos High School, rather than the spectrum's middle ground that was present in the speech at issue in *Kutchiniski* and the court found could be regulated. The Court disagrees. There is no dispute that E.B. told her parents a false story: namely, that E.B. was in a state of undress in a bathroom stall while Ms. Cironi approached the front of the stall and that E.B. saw Ms. Cironi's hair as she bent down to look underneath. Even outside the school context, courts have determined that the First Amendment permits restrictions on false and defamatory statements. *See Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)). Plaintiff spends a lot of ink in arguing that E.B.'s statements do not rise to the level of defamation, and that Mr. Ashton was not alleging criminal wrongdoing when he spoke with the police. But these arguments miss their mark. None of them demonstrate that E.B. was punished for off campus speech that—on Justice Alito's spectrum—is protected by the First Amendment. And to be sure, like in *Kutchiniski* the speech at issue here involved "serious or severe bullying or harassment targeting particular individuals [or] threats aimed at teachers or other students." *Kutchinski*, 69 F.4th at 357 (quoting *Mahanoy*, 141 S. Ct. at 2045 (majority opinion).

In *Kutchinski*, a student was punished for setting up a fake Instagram account as ostensibly belonging to a schoolteacher. The student shared the log-in information with other

students, and together the students posted false and sexually graphic messages on the account. The court of appeals determined the speech involved serious or severe harassment of teachers and a student. *Id.* at 358. The speech here does too. The undisputed record reflects that E.B. told her parents a false story about Ms. Cironi; that she repeated the false accusations to the police; and that she tried to get another student to lie for her. Moreover, all the admittedly false statements were about student/administrator interactions on school property. This undoubtedly was speech that Defendants could regulate.

## II.   Whether E.B. Was Responsible for the Speech

Plaintiff also seems to suggest that E.B. does not bear any responsibility for the speech in question. The gist of the argument here is that this is a bad game of telephone: E.B. was simply communicating what she heard from A.L. to her parents, and her stepfather was ultimately the one who relayed the speech to the school and then to the police.[8] Plaintiff, moreover, says E.B's stepfather relayed things that E.B. never told him, such as that Ms. Cironi locked eyes on E.B. *Kutchinski* addresses this situation too, and in that case determined that a student can be responsible for the speech of others when a "student causes, contributes to, or affirmatively participates in harmful speech." *Kutchinski*, 69 F.4th at 358. Here, there is no dispute but that Mr. Ashton acted on what E.B. told him and so E.B. caused, contributed to, and affirmatively participated in the harmful speech. While E.B. says certain aspects of what Mr. Ashton says might not be precisely as she had described them, E.B. admits that she told her family a false story, and that this was the story that was relayed to the school and to the police. Furthermore, E.B. directly made the remarks asking A.L. to lie for her, which was another basis for the

---

[8] To be sure, Dr. Sharp testified that E.B. told him directly on May 4, 2022, that Ms. Cironi had approached her stall and looked underneath while E.B. was urinating. Plaintiff disputes this testimony, however, and so the Court accepts Plaintiff's position for purposes of deciding the summary judgment motion.

school's discipline.  And she admits lying to the police officer herself when the interview started.

She is accountable for her knowingly false statements and related conduct.

*III.*     *Substantial Disruption*

The remaining question is whether the speech materially disrupted classwork or involved

substantial disorder or invasions of the rights of others.  *See Mahanoy*, 141 S. Ct. at 2047-48.

Here, the defense must "show that its action was caused by something more than a mere desire to

avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."

*Kutchinski*, 69 F.4th at 359 (quoting *Tinker*, 393 U.S. at 509).  Plaintiff contends that E.B.'s

actions do not rise to this level of disruption, and she recites a litany of things that did not

happen.  Neither E.B. nor her parents published their complaints on social media.  Neither E.B.

nor her parents went to the news media.  The school was not inundated with calls from

concerned parents.  There were no protests.  Ms. Cironi was not suspended or otherwise

disciplined.  And, Plaintiff says, Ms. Cironi was not reputationally harmed.

But all of this elides what did happen.  E.B. told her parents a fabricated story about a

school administrator in an intimate setting that caused her parents to complain first to the school

and then to the police.  Both the school and the police launched investigations.  When Ms. Cironi

learned of the investigation, she testified that her mind was "spiraling" and thinking of all the

"what-ifs."  When she arrived at school on May 5, 2022, Ms. Cironi was "sobbing hysterically."

(Cironi Dep.  99-100, ECF No. 38-4, PageID.797).  She sheltered in her office rather than go

about the normal course of her day.  (*Id.*).  Furthermore, E.B. asked another student to lie for her.

And Dr. Sharp testified that two other students became involved and communicated what A.L.

interpreted to be a threat.  (Sharp Dep. 157, ECF No. 38-3, PageID.770).  Not only did this

19

substantially disrupt normal school proceedings, it involved substantial disorder and invasion of the rights of others.

Accordingly, the Court concludes Defendants did not violate E.B.'s free-speech rights by disciplining her and that Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.  For the same reasons, Plaintiff's First Amendment retaliation claim fails. *See Kesterson v. Kent State Univ.*, 967 F.3d 519, 525 (6th Cir. 2020) (noting that a First Amendment Retaliation claim requires the plaintiff to demonstrate the First Amendment protects the subject speech).

### B.  Procedural Due Process

Plaintiff also claims Defendants deprived E.B. of her Fourteenth Amendment right to procedural due process by failing to provide her with adequate notice and a hearing before expelling her from the high school.  To prevail on a procedural due process claim, Plaintiff "must show that (1) she had a life, liberty, or property interest protected by the Due Process Clause; (2) she was deprived of this protected interest; and (3) the state did not afford her adequate procedural rights prior to depriving her of the property interest.  *Mbawe v. Ferris State Univ.*, 751 F. App'x 832, 841 (6th Cir. 2018).  Defendants do not contest the first two elements.  Thus, the only question is whether E.B. was afforded all the process that was due.

"In the school-disciplinary context, an accused student must at least receive the following pre-expulsion: (1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Doe v.*

*Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016); *see also C.Y. ex rel. Antone v. Lakeview Pub. Sch.*, 557 F. App'x 426, 431 (6th Cir. 2014) (setting out similar considerations).[9]

E.B. was afforded adequate process. There is no dispute that she received notice of the charges against her, and that Dr. Sharp explained the allegation—that E.B. had lied about Ms. Cironi and asked another student to lie on her behalf. (P. Ashton Dep. 49, ECF No. 46-2, PageID.1434; see also ECF No. 38-14). During this meeting with Dr. Sharp, E.B. was given an opportunity to explain her actions. (P. Ashton Dep. 47, ECF No. 46-2, PageID.1431). Plaintiff learned about the May 17th expulsion hearing on May 13, 2022, and contacted an attorney. (P. Ashton Dep. 54, ECF No. 46-2, PageID.1442). Plaintiff, Michael Ashton, E.B., and their attorney attended the expulsion hearing. (P. Ashton Dep. 56-57, ECF No. 46-2, PageID.1445-1446). Counsel, Plaintiff, and E.B. spoke to the board. (P. Ashton Dep. 56-59, ECF No. 46-2, PageID.1445-1451).

In a somewhat scant discussion, however, Plaintiff argues that E.B. was denied due process in two respects. First, Plaintiff contends E.B. did not receive sufficient notice. Defendants, Plaintiff says "cannot decide what speech that E.B. engaged in to justify an expulsion." (ECF No. 45, PageID.1018). That further means, Plaintiff claims, that Defendants "cannot decide which provision of their student code of board policy that EB violated." *Id.* Moreover, Plaintiff says the disciplinary packet that Dr. Sharp prepared for the Board's review

---

[9] In some circumstances, such as where the credibility of an alleged victim is at issue, due process may also require a way for the adjudicative body to evaluate the victim's credibility and to assess the demeanor of both the accused and his accuser. *See Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018). Here, both sides approach Plaintiff's due process claim as involving the three elements set out in *Cummins*. (See Pl.'s Br. 63, ECF No. 45, PageID.1016; Defs. Br. 30-31, ECF No. 38, PageID.710).

contained several material misstatements.  The sum total of these errors, Plaintiff contends, amounts to a violation of due process.  The Court disagrees.

Due Process "does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations."  *Mackey v. Montrym*, 443 U.S. 1, 13 (1979).  And here, the Court is satisfied that Plaintiff, and E.B., received all the process that was constitutionally required.  According to Plaintiff, when she (along with E.B. and Michael Ashton) met with Dr. Sharp on May 9, 2022, he showed them a prepared (albeit incorrectly dated) letter detailing his recommendation that E.B. be expelled.  The justification for the discipline was described as follows:

> [E.B.] was in a bathroom stall with another girl.  They appeared to be vaping.  Ms. Cironi checked the bathroom, but did not know two girls were in a stall because one was on the toilet seat so her feet did not show.  [E.B.] decided to text her parents in an attempt to get Ms. Cironi in trouble.  [E.B.] made up a story saying Ms. Cironi looked into the stall while [E.B.] was going to the bathroom.  This turned out to be a false accusation and [E.B.] and her parents decided to file a false police report which accused Ms. Cironi of criminal wrong doing.  Police were contacted and Dr. Sharp talked to the parents.  Ms. Cironi had also called the parents to explain what really happened.  In spite of this parents filed the police report against Ms. Cironi.  Discipline will be issued per the student handbook.  [E.B.] actively encouraged at least one other student to lie to administration and police in an attempt to get Mrs. [sic] Cironi in legal trouble.

(ECF No. 38-14).

While Plaintiff denies some parts of this summation, there can be no dispute that before the disciplinary hearing, she was at least aware that E.B.'s false statements regarding Ms. Cironi, and her attempt to get A.L. to lie for her, were the basis of the recommended discipline.  To the extent Plaintiff disputed that characterization, she had the ability to contest the charges at the hearing, as Plaintiff admits.  Due process does not require anything more than that.

### C.  Substantive Due Process

Plaintiff next claims that Defendants deprived E.B. of her Fourteenth Amendment right to substantive due process.   "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used."  *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)).   The clause "protects 'fundamental rights' that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'"  *Doe v. Michigan Dept of State Police*, 490 F.3d 491, 499 (6th Cir. 2007) (quoting *Palko v. Conn.*, 302 U.S. 319, 325 (1937).  "Such rights include 'the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion."  *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

"Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'"  *Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.,* 640 F.3d 716, 728 (6th Cir. 2011).   Plaintiff reasons the expulsion in this case "shocks the conscience."   (ECF No. 45, PageID.1018).   Plaintiff offers no developed argumentation here beyond this barebones assertion.  The Court determines there is no substantive due process violation here.

In the school discipline context, the Sixth Circuit Court of Appeals has remarked that "a substantive due process claim will succeed only in the 'rare case' when there is 'no rational relationship between the punishment and the offense.'"  *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (citing *Rosa R. v. Connelly,* 889 F.2d 435, 439 (2d Cir.1989)).   Drawing all inferences

in Plaintiff's favor from the summary judgment record, the Court concludes that Plaintiff cannot show the absence of a rational relationship between E.B.'s actions and her expulsion.

Plaintiff argues there is no rational relationship between E.B.'s actions and her expulsion because E.B. did not engage in any threatening, violent, or sexual speech.  There was no material disruption, she says, to the high school's operations.  And E.B. was a "first-time offender."  But the severity of the speech, the impact to the school, administrators, and other students, and E.B.'s disciplinary history were all considered by the Board. And "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).  "Executive action shocks the conscience when it is 'arbitrary, or conscience shocking, in a constitutional sense.'" *Doe v. Miami Univ.*, 822 F.3d 579, 599 (6th Cir. 2018) (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 547 (6th Cir. 2012)).  Here, the school board's decision to expel E.B. was rationally related to the school's interest in investigating and disciplining a student's false statements about a school administrator taking place in an intimate setting, and the student's efforts to get another student to lie for her.  Accordingly, the defense is entitled to summary judgment on the substantive due process claim.

### D.  Fourth Amendment

Finally, both sides analyze Plaintiff's challenges to the two searches under the Fourth Amendment.  The Fourth Amendment to the United States Constitution provides that the government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  The "ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"  *Vernonia Sch. Dist. 47J v.*

*Acton*, 515 U.S. 646, 652 (1995).  "Whether a particular search meets the reasonableness standard 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"  *Id.*  (quoting *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 619 (1989)).  In conducting the reasonableness inquiry, context matters.  "Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children."  *Id.* at 656.

 In *Brannum v. Overton Cty. School Bd.*, 516 F.3d 489 (6th Cir. 2008), the Sixth Circuit Court of Appeals applied a two-step framework for conducting a reasonableness inquiry in the school search context.  Under this framework a reviewing court first considers whether the state action was "justified at its inception."  At the second step, the court asks whether the search "as actually conducted 'was reasonably related in scope to the circumstances which justified the [surveillance/search] in the first place.'"  *Id.* at 495 (quoting *New Jersey v. T.L.O.*, 469 U.S. 324, 341 (1985)).  Both sides apply this framework to the two searches of E.B.

### I.    April 8, 2022, Search

Plaintiff contends that the no-contact search of her person on April 8, 2022, violated the Fourth Amendment.  Plaintiff offers little discussion here, but throughout the factual section of her brief makes points about school administrators failing to review surveillance video from the school hallway, conducting the search based on the report of a single student, and failing to inform parents about the search after the fact.

To begin, under the first step of the framework "[a] student search is justified in its *inception* when there are reasonable grounds for suspecting that the search will garner evidence that a student has violated or is violating the law or the rules of the school, or is in imminent

danger or injury on school premises." *Brannum*, 516 F.3d at 495-96.  Here, Ms. Cironi testified

that she received a report from a student about other students, including E.B., vaping in the

school bathroom.   This, combined with the administrators' experiences that year, provided

reasonable grounds for suspecting that E.B. and other students were vaping in the school

bathroom.   Plaintiff's undeveloped and unsupported arguments to the contrary are unavailing.

Plaintiff contends that the school could have checked video surveillance footage of the school

hallway to see if E.B. disposed of a vape pen.   But the report to Ms. Cironi was that E.B. and

others were vaping in the school bathroom.   Thus what was going on in the hallway is immaterial

to the complaint that school administrators were investigating.   Finally, Plaintiff challenges the

credibility of the student who reported E.B. and other students to Ms. Cironi.   Credibility

evidence could be relevant to show that a reasonable official wouldn't have believed the report.

*Stanford v. Northmont City Sch. Dist.*, No. 23-3203, 2023 WL 6389624, at *3 (6th Cir. Oct. 2,

2023).   But here Plaintiff offers no such evidence.   She simply speculates that the student is not

credible because there were widespread complaints about vape usage at the school.   But the fact

that the school was receiving widespread complaints, standing alone, does nothing to indicate

that a reasonable school official would not have believed the student's report.

Turning to the second step, the no-contact search was permissible in scope and manner.

Here, the Court of Appeals has determined that a search "is permissible in its scope when the

measures adopted are reasonably related to the objectives of the search and not excessively

intrusive in light of the age and sex of the student and the nature of the infraction."   *Brannum*,

516 F.3d at 496 (quoting *T.L.O.*, 469 U.S. at 342).   "It is a matter of balancing the scope and the

manner in which the search is conducted in light of the students' reasonable expectations of

privacy, the nature of the intrusion, and the severity of the school officials' need in enacting such

policies, including particularly, any history of injurious behavior that could reasonably suggest the need for the challenged intrusion." *Id.* (internal citation omitted).  "[T]he method chosen by the defendants . . . need not have been the only method available or even the one this court might have chosen; it is necessary, however, that the method chosen was, in the circumstances, justifiably intrusive in light of the purpose of the policy being carried out."  *Id.*

Generally, "students have a less robust expectation of privacy than is afforded the general population."  *Id.*  But this does not mean that a student's expectation of privacy is nonexistent. *Id.*  For example, "students retain 'a significant privacy interest in their unclothed bodies.'"  *Id.* (quoting *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005).  The summary judgment record reflects, however, that Defendants maintained adequate procedural safeguards to protect students' privacy.  The undisputed testimony is that E.B. was not patted down or asked to undress, she was merely asked to stand up, empty her pockets, lift up her pants legs, and turn down her waistband.  The search was conducted in an office, with a female staff member present.  Under *T.L.O* and *Vernonia*, this search did not violate the Fourth Amendment.

## II.     May 4, 2022, Search

Applying the above framework to the May 4, 2022, bathroom check, the Court finds no Fourth Amendment violation.

Here, the undisputed deposition testimony is that school officials began spot checking school bathrooms to combat rising violence and vape usage follow student complaints.  This is enough to satisfy the first part of the inquiry.  *See Brannum*, 516 F.3d at 495 (search justified at its inception where video surveillance equipment was installed to increase security, which was "an appropriate and common sense purpose[.]").  The bathroom checks were permissible in their scope as well after balancing the scope and manner of the search in light of the students'

27

expectation of privacy, the nature of the intrusion, and the severity of the school officials' need in enacting such policies.

A student's expectation of privacy is already diminished, given the relaxed standard in school settings.  Moreover, as the defense points out, there is also a diminished expectation of privacy in bathroom stalls viewed from common areas.  Indeed, in other contexts, courts have found that "[e]ven when an individual has entered a stall, there is no legitimate expectation of privacy to the extent he may be seen by someone in the common area of the restroom."  *See Wright v. Bella Vista Police Dep't*, 452 F. Supp. 3d 830, 841 (W.D. Ark. 2020) (citing *United States v. White*, 890 F.2d 1012 (8th Cir. 1989)); *see also Stern v. New Haven Cmty. Sch.*, 529 F. Supp. 31, 35 (E.D. Mich. 1981) (in case where school officials had a limited view of the boys' restroom through a two-way mirror finding no Fourth Amendment violation after the plaintiff's privacy interest was weighed against the defendant's duty to maintain order and discipline and fulfill their duties of custodians of parents' children).  The intrusion on the students' expectation of privacy here was modest.  The bathroom checks in this case were conducted by a school administrator or security officer who entered a bathroom corresponding to his or her gender.  The check took place from the common area of the bathroom and consisted of a brief glance under the stall partitions to ascertain the apparent number of students within a stall.   E.B., furthermore, testified that she was aware that these types of searches were being conducted.  Such intrusion was far less severe than in those cases where a Fourth Amendment violation was found.  *See Brannum*, 516 F.3d at 497-98 (where video surveillance was aimed at areas in which students dressed and undressed).  The scope of the bathroom checks in this case were congruent to the need for the search.  Deposition testimony established that school administrators began bathroom checks after students complained they did not feel safe using the bathrooms due to violence and

vape use.  Vape cartridges could contain nicotine or THC.  (Sharp. Dep. 47, ECF No. 38-3, PageID.743).  A school has an "important interest" in keeping drugs off of school property. *Stanford*, 2023 WL 6389624 at *2.

Weighing all of the above under the *T.L.O* and *Vernonia* framework, the Court finds that E.B.'s Fourth Amendment rights were not violated during the May 4, 2022, bathroom search.

### 3.  *No* **Monell** *Violation*

To establish municipal liability under § 1983, a plaintiff must establish that a constitutional violation caused his or her harm, and that the defendant entity was responsible for the violation.  *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (citing *Cash v. Hamilton County Dept of Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004)). The Court need not wade into the parties' arguments regarding the school's responsibility because the Court has determined that Defendants are entitled to summary judgment on Plaintiff's substantive constitutional claims.  Absent a constitutional violation, the Defendants are entitled to summary judgment on Plaintiff's *Monell* claim based on the same conduct.  *See Farinacci v. City of Garfield Heights*, 461 F. App'x 447, 453 (6th Cir. 2012); *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000)); *see also Przybysz v. City of Toledo*, 746 F. App'x 480, (6th Cir. 2018) ("As a threshold matter, there can be no municipal liability under *Monell* when there is no constitutional violation").  For the reasons set out above, the Defendants have demonstrated they are entitled to summary judgment in their favor on all of Plaintiff's constitutional claims, and thus Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.

#### 4. *The Individual Defendants are Entitled to Qualified Immunity*

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries:  "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006)); *cf. Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that the two-part test is no longer considered mandatory; thereby freeing district courts from rigidly, and potentially wastefully, applying the two-part test in cases that could more efficiently be resolved by a modified application of that framework).  Here, Plaintiff has not demonstrated a constitutional violation.  Accordingly, the individual Defendants are entitled to summary judgment based on qualified immunity.

### CONCLUSION

Plaintiff tries to pitch this case as involving widespread searches of students at Okemos High School untethered to any reasonableness and absent any parental notification.  E.B. got caught up in the dragnet, Plaintiff contends, and while E.B. may have embellished what happened, Plaintiff believes the real reason she was subjected to discipline was E.B.'s and Mr. Ashton's complaints about the search.  The summary judgment record, however, fails to support this narrative.  E.B. was subject to a minimal, no contact, search in April 2022 after school

officials reasonably relied on another student's report that E.B. and other students were vaping in a school bathroom.  Three weeks later, E.B. was again subjected to a reasonable search when a school official of the same gender entered the bathroom and conducted a brief check of the bathroom stalls from the bathroom's common area.  E.B. lied to her parents about what actually happened; lied to the police too; and also asked another student to lie for her.  She admits all this. School officials determined that this was a violation of the school's policies, and E.B. was expelled for a time before being reinstated.  None of this violated E.B.'s constitutional rights and Defendants are entitled to summary judgment as a matter of law.

**ACCORDINGLY, IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (ECF No. 38) is **GRANTED.**

2. Plaintiff's Motion for Leave to Supplement (ECF No. 55) is **DENIED** and the Defendants' Stipulation (ECF No. 61) is **REJECTED.**

3. This case is **DISMISSED.**  A separate Judgment shall issue.

Dated: _____February 9, 2024_____      /s/ Robert J. Jonker _____
                                        ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE